(No. 14032—Decree affirmed.)

FRANK P. SADLER, Appellant, vs. JOHN G. DRENNAN et al.
Appellees.

*Opinion filed December 22, 1921—Rehearing denied Feb. 20, 1922.*

1. SPECIFIC PERFORMANCE—*option agreement is not binding if no consideration is given.* An agreement by a land owner in his correspondence with a prospective purchaser to give the purchaser ten days within which to determine whether he will take the land at a certain price is not binding if no consideration is given for the option, and the owner may repudiate it at any time before a contract of sale is finally consummated under it.

2. SAME—*chancellor must deny relief where evidence is equally balanced.* Before a court of equity can grant specific performance the rights of the complainant must be established by a preponderance of the evidence, and where the evidence is equally balanced the chancellor must deny the relief.

3. APPEALS AND ERRORS—*when chancellor's finding will not be disturbed.* The chancellor's finding on the facts from conflicting oral testimony will not be set aside unless it is against the manifest weight of the evidence.

APPEAL from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding.

FRANK P. SADLER, *pro se,* and ALBERT O. OLSON, (NAHUM MORRILL, and WILLIAM T. PRIDMORE, of counsel,) for appellant.

FREDERIC R. DEYOUNG, and MICHAEL J. SULLIVAN, for appellees.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

September 12, 1919, appellant, Frank P. Sadler, filed a bill in the superior court of Cook county seeking to compel the specific performance of an alleged contract whereby it is claimed that appellee John G. Drennan agreed to sell and convey to appellant a quarter section of land in Sas-

katchewan, Canada. At the time the bill was filed the title to the land was in Walter R. Drennan, the son of John G. Drennan, and he was therefore made a defendant. Defendants filed separate answers, which were subsequently amended. Replications were filed to the amended answers. After hearing the evidence and the arguments of counsel the chancellor entered a decree dismissing the cause for want of equity. From that decree this appeal is prosecuted.

In July, 1909, John G. Drennan contracted to purchase at wholesale from the Canadian Northern Railway Company 10,000 acres of land in the province of Saskatchewan, to be selected by his son and agent, Walter R. Drennan, at the agreed price of $9.50 an acre. The initial payment was deposited with Davidson & McRae, general land agents of the railway company, and Walter Drennan and one Field, representing Davidson & McRae, proceeded to make the selections. In making the selections the quarter section which is the subject matter of this litigation was included by mistake. The railway company notified Drennan that this quarter section was being held for town site purposes and that it could not be included in his contract. Drennan was buying this land on liberal terms and was not in a position to enter into a controversy with the railway company over this quarter section, but he wrote the company stating that inasmuch as this quarter section was in the vicinity of other lands he had selected he would like to have it remain on the list of his selections, the railway company to have the privilege of withdrawing it in the event it decided finally to use it for town site purposes. August 20, 1909, Drennan received a letter from Davidson & McRae advising that they would permit him to select the quarter section with the understanding and agreement that he would hold it for one year and would re-convey it to the railway company if it required it for town site purposes. Drennan immediately mailed this letter to his son, Walter, at Outlook, Saskatchewan, where Walter had established an office for the trans-

action of a general land business. July 6, 1909, Drennan
gave to his son, Walter, a power of attorney giving him
full power and authority to act in relation to Drennan's
lands in Canada as fully as could Drennan himself. Dren-
nan never saw any of these lands and all the business in
relation to them was conducted by the son.

About the first of October, 1909, Sadler called upon
Walter Drennan at Outlook, Canada, and inquired about
lands which the Drennans had for sale in that vicinity. A
half section and a quarter section, not of the lands in ques-
tion, were priced to him at $12.50 an acre. Sadler returned
to Chicago and had a talk with John G. Drennan regarding
these lands. Drennan advised him that he knew nothing
about the land and that Sadler would have to do his busi-
ness with Walter. Sadler wrote Walter requesting him to
send him a map of the lands that were for sale in the vicin-
ity of Outlook. Walter sent a map upon which certain
lands were marked as lands for sale by him as the agent
of his father. Sadler states that the quarter section in dis-
pute was marked and Walter states that it was not. Sad-
ler took the map to Drennan's office. There is some dispute
about what was said on this occasion, but it is agreed that
Sadler displayed the map he had received from Walter and
pointed out several tracts of land near Outlook which were
marked and which Sadler said were lands that Walter had
indicated were for sale. Drennan says that he replied that
Walter had full charge of the matter and that whatever Wal-
ter said was satisfactory to him. Following this conversa-
tion Sadler addressed a letter to Walter accepting Walter's
offer to sell the quarter section not in controversy here and
inclosing his check for $200 in part payment of the purchase
price. He also wrote Walter that he had closed a deal with
his father to purchase the quarter section here in contro-
versy on the same terms that Walter had made him on the
other quarter section, and inclosed his check for $200 as
the first cash payment. He asked Walter to make out con-

301—22

tracts for the two quarter sections and to forward them to him for his signature. Walter promptly replied to this letter, telling Sadler that a contract would be made out and forwarded to him for the quarter section he had priced him, but that the quarter section here in controversy was not available and that he could not send him a contract for that piece. At the same time he wrote his father, inclosing the contract for the first quarter section, which he directed his father to deliver to Sadler. He also requested his father to find out from Sadler if he should apply the $200 sent as first payment on the quarter section in controversy as an additional payment on the quarter section covered by the contract which he inclosed.

A few days after receipt of the letter from Walter advising that the land in controversy was not available Sadler went to John G. Drennan's office and had a further conversation with him about the land. The contract for the quarter section that was not in dispute was signed and delivered. The two checks for $200 were applied on this quarter section with Sadler's consent, making the initial payment $400. Sadler insisted that Drennan had agreed to sell him the quarter section in dispute, but Drennan told him that he could not sell it because Davidson & McRae had a right to withdraw it at any time within a year, and that if they wanted an extension of that time he would have to give it to them, because he was in no position to have any trouble with them. This conversation occurred about the first of November, 1909. Between that time and November 6 there were other conversations, in which Sadler continued to insist that he had the right to this land. November 6, 1909, Sadler came to Drennan's office, and after considerable discussion Drennan finally agreed to let Sadler have the land if the railway company released its claim to it. Sadler wanted this agreement put in writing, and the letter which Sadler claims is the contract was dictated and signed by Drennan. This letter sets out at some length

the relations between Drennan and the railway company regarding the quarter section in dispute, and then states that if the railway company did not take the land under its option by.July 5, 1910, or within such further time as might be granted on request, Drennan would give Sadler a ten-day option to buy the quarter section on the same terms on which he had bought the other quarter section. Sadler took this letter to his office and immediately wrote Drennan a letter in which he accepted the proposition. There was nothing in Drennan's letter which called for an acceptance, and therefore the acceptance adds nothing to .what was in the letter itself. By his letter of November 6 Drennan agreed to notify Sadler when the land was for sale and to give Sadler ten days within which to determine whether he wanted the land. There was no consideration for this agreement, and Drennan had a right to repudiate it at any time before a contract of sale was finally consummated under it.

Sadler contends that he had certain rights in this quarter section by reason of the conversations had with respect thereto prior to November 6, and that his relinquishment of these rights was the consideration for the option agreement. We do not agree with this contention, but we do not consider the point controlling if the contention were sustained. As will be seen later, Drennan repudiated whatever rights Sadler had under the letter of November 6, and Sadler took no action against him for more than eight years. Drennan was mistaken when he stated in his letter of November 6 that the railway company's option expired July 5, 1910. It did not expire until August 20, but, as we have said, the letter covering this point had been sent to Walter and the date was inserted from memory. Still believing that the railway company's option expired July 5, 1910, Drennan wrote Davidson & McRae at their offices in Winnipeg on July 6, 1910, and asked them if he was at liberty to sell the land. He waited for a reply until July 14, and

having received none, he then addressed a letter to Sadler in which he inquired if he was ready then or within ten days from receipt of the letter to purchase the land. Sadler received this letter on the morning of the 15th and left immediately for Canada. He arrived at Outlook July 19, 1910, and went to the hotel, where he met Walter Drennan. There is a dispute as to what took place during this conversation. Sadler states that he requested Walter to furnish him with a couple of blank forms of contract, so that if he decided to take the land he could make out the contract, but that Walter refused to provide him with the forms, and that he then took a piece of hotel stationery on which he wrote a demand on Walter to furnish him with two blank forms of their land contracts, so that he might sign the same and forward them to one Martin, an attorney in Chicago whom he had authorized to close the deal with John G. Drennan upon receipt of instructions by telegraph. In this notice Sadler recognized the Drennan letter of November 6 as an option, by referring to the land as land "which your father has heretofore optioned to me." Sadler states that Walter refused to receive this notice or to have anything to do with him. Walter says that Sadler demanded a contract for the quarter section of land in controversy and that he did not demand blank forms of contract; that he told Sadler that he could not have the quarter section; that the railway company had not released the land to them and that it was not for sale; that he told Sadler that the latter had obtained the letter from his father by misrepresenting that he (Walter) had priced this land to Sadler; that they had some other words about the matter and that he made it clear to Sadler that he could not have the land.

July 14, 1910, Davidson & McRae wrote John G. Drennan, in reply to his letter of July 6, that the railway company would require the quarter section of land for its purposes and that the same would not be available to Drennan for selection. Drennan testifies that as soon as he re-

ceived this letter he called Sadler's office by telephone and learned that Sadler had gone to Canada; that he talked to a man representing himself to be Martin, who said that he was authorized to act for Sadler with respect to the Canada land, and that he told this man that he had just received a letter from Davidson & McRae that the quarter section in question was withdrawn from his selections and was not for sale. July 21, 1910, Sadler wired Drennan, "Will take land Martin my Chicago office ready to make payment and close deal for me." On the same day Martin came to Drennan's office and told him that Sadler had given him a power of attorney to close the deal for the Canada land, and that he was there under telegraph instructions from Sadler to make the first payment and to sign the contract. Drennan showed him the letter from Davidson & McRae and told him that the land was not for sale. October 19 following, Sadler came to the office of Drennan and told him that he had come for the purpose of closing the deal for the land. Drennan told Sadler that the land had been withdrawn and that he had no further rights in it. Sadler insisted on having the land and suggested to Drennan that he compel the railway company to let him have it. Drennan told him that he was in no position to have trouble with the railway company, but that Sadler could sue him and the company and thereby determine his rights. Sadler returned to his office, and, as he had done after practically every interview he had had with regard to this land, he immediately dictated a letter to Drennan in which he set down what he concluded had been settled in the conversation and what rights he had gained thereby. In this letter he told Drennan that he considered that his rights to this land were superior to those of anyone else, and then he expressed the hope that the land might be delivered to him at an early date. April 29, 1911, Sadler again wrote Drennan demanding the land. To this letter Drennan replied May 1: "On July 21, 1910, you wired me from Saskatche-

wan about this land, and your Mr. Martin on the morning of the 22d, as I recall it, called at my office, and I explained to him, showing him the correspondence, that this deal was off and that you could not have the land. On your return I explained to you the same. All I can do is to repeat to you what I said to Mr. Martin and to you. If you ever had any binding contract with me in regard to this land it was broken July 22, 1910. I explained this to you carefully several times, and all I can say is, that if you feel that you have any legal claim upon me on account of this land it has existed from July 22, 1910, and you are at liberty to bring suit therefor if you desire. If you do so, let me know and I will enter my appearance and we will end the matter." May 6, 1911, Sadler replied to Drennan's letter, repeating his demand for the land. In this letter he said, among other things: "I further recognize that I have at least five years from last July in which to institute any action for damages in this matter, and the damages will grow with the lapse of time, for this land is increasing in value." In this letter, and many previous letters, Sadler expressed the hope that this misunderstanding might be settled without litigation because of the intimate and long-standing friendship existing between the parties. Drennan replied to this letter on May 8, and added his regrets that it looked as if a lawsuit might be necessary to settle their troubles, but stated emphatically that he had repudiated whatever rights Sadler had under the letter of November 6, 1909, and that he considered the matter closed.

So far as the record shows there were no other conversations or letters which passed between the parties for more than six years. May 28, 1917, Sadler again wrote Drennan regarding the land, and asked him if he was willing to take up the matter with a view to settling the controversy without litigation. Drennan replied that he had no interest in the land and refused to have any further discussion of the matter. Sadler replied, again expressing his regret that

the matter could not be settled without litigation but still insisting that he was entitled to the land, and stating that he saw no other way in which to enforce his rights than by beginning suit. Shortly after this Sadler went to Canada and examined the records. June 10, 1917, he found that the title to this land was in John G. Drennan. Seven years had passed since Drennan had unqualifiedly repudiated whatever rights Sadler had under the option agreement, and yet Sadler had taken no action to compel the performance of the agreement. The Drennans testify that John G. Drennan had had no interest in this quarter section of land since July 14, 1910; that Walter Drennan had rendered valuable services to the railway company in regard to disposing of its lands, and that when the railway company finally decided not to use the quarter section for town site purposes it conveyed the land to him; that title was taken in the name of John G. Drennan because Walter was at that time contemplating enlistment in the Canadian army for overseas service; that the title remained in the name of John G. Drennan until Walter had. been rejected; that Drennan did not convey the land to Walter until June 23, 1917, and that the transfer was placed on record four days later. In January, 1918, Walter enlisted in the army of the United States and remained in the service until May, 1919.

Sadler claims that this quarter section was priced to him at $12.50 an acre, and all the testimony shows that it was worth not more than $15 an acre in 1910, when the land was withdrawn from the market. At that time the land lay at least seven miles from a railroad. It is now within two miles of two railroads,—the Canadian Pacific and the Canadian Northern. It has been under cultivation for several years and is worth at least $50 or $60 an acre.

On the material points in this case the testimony is in hopeless conflict. Considering fairly all the evidence, the most that can be said is that it is equally balanced. Before a court of equity can grant specific performance the rights

of the complainant must be established by a preponderance of the evidence. It follows, therefore, that where the evidence is equally balanced the chancellor can do nothing but deny the relief. The chancellor saw and heard the witnesses and was in a better position to weigh their testimony than we are. We will not set aside his finding unless we can say that it was against the manifest weight of the evidence. We have not attempted to set out in detail all the correspondence or all the conversations out of which this litigation arises, but we think from what we have said it is manifest that the finding of the chancellor cannot be disturbed.

The decree is affirmed.                *Decree affirmed.*